IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | |
|---|---|
| PAULA HALL<br><br>Plaintiff,<br><br>v.<br><br>ELDERLY HOUSING DEVELOPMENT & OPERATIONS CORPORATION<br>Defendant. | Case No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Paula Hall, by and through undersigned counsel, brings this Complaint against Defendant Elderly Housing Development & Operations Corporation (collectively, "EHDOC" or "Defendant"). This action is brought by Plaintiff for relief from retaliatory actions under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33.

## INTRODUCTION

1. Defendant EHDOC is a non-profit organization operating under section 501(c)(3) of the Internal Revenue Code. It oversees the management of senior housing communities, comprising more than 4,700 apartment units across fourteen states, as well as in Washington, D.C., and Puerto Rico.

2. Plaintiff Paula Hall served as Vice-President of Asset Management at EHDOC from June 2024 until her termination on January 31, 2025.

3. While employed with EHDOC, Plaintiff Hall observed numerous unlawful and fraudulent practices that she believed constituted violations of the FCA, 31 U.S.C. § 3729 -3733 and was unlawfully terminated only after complaining of the violations

4. Plaintiff Hall brings this action pursuant to the anti-retaliation provision of the FCA, codified at 31 U.S.C. § 3730(h).

5. The FCA prohibits an employer from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against an employee for engaging in lawful acts in furtherance of an FCA action or for efforts to stop one of more violations of the Act.

6. To establish a retaliation claim under § 3730(h), the plaintiff must show: (i) she engaged in protected activity under the FCA; (ii) her employer had knowledge of this protected activity; and (iii) she suffered an adverse employment action as a result of engaging in the protected activity.

7. During her employment at EHDOC, Plaintiff Hall engaged in protected activity by investigating, raising concerns about, and reporting what she reasonably believed to be fraudulent conduct involving the misuse of federal funds (i.e., violated certifications and assurances made to the federal government to secure federal funds) and the ongoing submission of false certifications and assurances to the federal government.

8. Plaintiff Hall's internal reports and complaints specifically addressed conduct she believed violated the FCA, including schemes involving improper billing practices and misrepresentations made to the federal agencies, including the Department of Housing and Urban Development (HUD).

9. EHDOC was aware of Plaintiff Hall's protected activity. Her concerns were communicated to senior leadership. Within days of engaging in this protected activity, Plaintiff Hall was subjected to retaliatory treatment, culminating in her termination on January 31, 2025. This adverse action was taken in direct response to her efforts to expose and prevent violations of the FCA. As a result of EHDOC's unlawful retaliation, Plaintiff Hall has suffered economic and reputational harm, including lost wages, diminished career opportunities, and extreme emotional distress.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under the laws of the United States, specifically the False Claims Act, 31 U.S.C. § 3730(h).

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) & (c) and 31 U.S.C. § 3732(a) because Defendant EHDOC maintains its principal place of business in Plantation, Florida, transacts business in this district, and

because a substantial part of the events or omission giving rise to the claims occurred within this district.

12. Defendant EHDOC is subject to personal jurisdiction in this district as it regularly conducts business within the State of Florida and maintains its corporate headquarters in this district.

## PARTIES

13. Plaintiff Paula Hall is an individual and former employee of EHDOC. At all relevant times, Plaintiff was employed by EHDOC. At all relevant times, Plaintiff was employed by EHDOC as Vice President of Asset management, where she performed duties related to the oversight and management of senior housing assets. The plaintiff resides in Theodore, Alabama.

14. Defendant Elderly Housing Development & Operations Corporation "EHDOC" is a nonprofit corporation organized under Section 501(c)(3) of the Internal Revenue Code, with its principal place of business located in Plantation, Florida.  EHDOC operates and manages senior housing communities across fourteen states, as well as in Washington D.C. and Puerto Rico. At all relevant times, EHDOC employed Plaintiff and exercised control over the terms and conditions of her employment.

## STATUTORY AND REGULATORY FRAMEWORK

I. The Federal False Claims Act

15. The False Claims Act ("FCA") provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or who knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim to the Government is liable for damages in the amount of three (3) times the amount of loss the Government sustained and penalties which range between $5,500 and $11,000 per claim.[1] 31 U.S.C. § 3729(a). For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* at § (b). "[N]o proof of specific intent to defraud is required" for a successful claim under the FCA. *Id.*

16. The FCA protects employees, contractors and agents from retaliation for engaging in acts to stop an employer from submitting false claims, providing the following relief: "reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages

---

[1] Federal law periodically adjusts the penalty amounts for inflation. As of July 3, 2025, FCA penalties range from a minimum of $14,308 to a maximum of $28,619.

sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." 31 U.S.C. § 3729(h).

## FACTUAL ALLEGATIONS

17. Plaintiff Paula Hall is a seasoned professional with over 35 years of experience in the asset management industry. Since 1997, she has held executive leadership roles, simultaneously overseeing portfolio that included up to 220 properties and 40,000 apartment units.

18. On June 24, 2024, Plaintiff Hall began working for EHDOC as Vice-President of Asset Management.

19. Within weeks of being employed, Plaintiff Hall started observing severe and pervasive fraud, waste, and abuse within the organization.

20. As a 501(c)(3), EHDOC is a tax-exempt entity that touts itself as "a national leader and advocate at all levels of government in promoting independent living and life enrichment for seniors."

21. According to their mission statement, EHDOC "seeks to provide its residents with safe, affordable housing and access to supportive health and social services to help residents live independently and with dignity."

22. Every year, EHDOC is awarded millions of dollars from the U.S. Department of Housing and Urban Develop (HUD) to provide adequate housing to seniors throughout the United States.

23.     Specifically, Defendant EHDOC receives federal funds pursuant to Section 202 of the Housing Act of 1959. Section 202 is a federal housing program administered by HUD that provides affordable housing with supportive services for very low-income seniors, and project rental assistance contracts, or PRAC: an agreement that enables the owner of HUD Section 202 properties to receive project rental assistance funds. It also helps nonprofit organizations such as Defendant EHDOC build, manage, and operate affordable housing for people 62 years of age who meet the income requirements. These contracts enable the owner to receive project rental assistance funds, which make up the difference between a community's approved operating costs and rents received from the property's residents.

24.     In applying for and accepting Section 202 funding, EHDOC was required to submit certain certifications and assurances demonstrating their commitment to complying with the program requirements, including those relating to fair housing, civil rights, and financial and property management.

25.     Under 24 C.F.R. § 891.600(b), recipients of federal funding—such as Defendant EHDOC—are fully responsible for all management functions related to the operation of federally assisted senior housing facilities. These responsibilities explicitly include tenant selection and admission, conducting required income reexaminations for residents in assisted units, rent collection, termination of tenancy

and eviction, and all repair and maintenance functions. This includes both routine and extraordinary maintenance, as well as the replacement of capital items.

26. Additionally, pursuant to 24 C.F.R. § 5.703, EHDOC is required to ensure that all residents live in safe and habitable dwellings. This regulation mandates that all components of HUD-assisted housing, whether located inside the units, outside the building, or in common areas, must be functionally adequate, operable, and free from health and safety hazards.

27. Despite these regulatory obligations, Plaintiff Hall reasonably believed that EHDOC failed to perform these duties in a manner consistent with federal requirements, resulting in unsafe, unsanitary, and hazardous living conditions for elderly residents, as detailed herein.

28. Specifically, Plaintiff Hall observed that Defendant EHDOC had engaged in a longstanding pattern and practice of neglecting the senior living facilities under its management, many of which are funded in whole or in part by federal dollars.

29. During her six months' tenure at EHDOC, Plaintiff Hall received numerous repeated complaints from residents regarding hazardous and substandard living conditions. In her capacity as Vice President of Asset Management, she took these concerns seriously, conducted investigations, and made efforts to address the issues.

30. However, Plaintiff Hall's attempts to remedy the conditions were met with resistance from senior leadership, including EHDOC's president and CEO, Melanie Riberio.

31. The Defendant's consistent violations included, but were not limited to: pervasive mold infestations and lack of air conditioning in residential units; malfunctioning stoves that activated automatically and remained unrepaired for extended periods which posed significant fire hazards; emergency pull cords that had been nonfunctional for years; severe roof leaks; bathtubs collapsing through floors; lack of heat in common areas, hallways, and management offices; elevators that were frequently inoperable; and master keys remaining in the possession of former employees, thereby compromising resident safety.

32. These conditions demonstrate a willful disregard for the health and safety of vulnerable senior residents. Despite this, EHDOC knowingly submitted annual certifications and assurance to the federal government affirming that it was properly managing its facilities. The organization consistently failed to deliver the services and maintenance required under applicable housing regulations and funding agreements.

33. To make matters worse, while neglecting the deteriorating living conditions of vulnerable senior residents, EHDOC's leadership – including President and CEO Melanie Riberio – authorized and undertook lavish renovations of executive

luxury furnishing for senior executives, all while failing to allocate adequate resources to address urgent health and safety concerns in the housing facilities under its care.

34. Additionally, Plaintiff Hall observed a pattern and practice of what she believed to be fraudulent accounting practices.

35. As a recipient of Section 202 funding, EHDOC is required to report all operating costs accurately and transparently for each individual property under its management. Each property operates under the oversight of a separate advisory board and is financially independent, with its own budget and operational obligations.

36. However, EHDOC has engaged in improper accounting practices by reallocating operational costs from one property to others within its portfolio. This misallocation violates HUD's financial management requirements and undermines the integrity of Operating Cost Adjustment Factors (OCAFs), which are calculated using audited financial statements and are essential for determining appropriate rent adjustments under Section 202/8 contracts.

37. These accounting practices also caused EHDOC to submit false and fraudulent financial statements and reports to the federal government in violation of federal regulations.

38. On or about January 27, 2025, and January 29, 2025, Plaintiff Hall participated in conference calls with members of EHDOC's senior executive

leadership, including CEO Melanie Riberio and other high-ranking officials. During this call, Plaintiff reported what she reasonably believed to be extensive fraud, waste, and abuse occurring within the organization. She further reported to and warned the senior executive leadership and the CEO that if EHDOC failed to address these violations, the organization could face serious penalties from the federal government.

39. Consequently, on or about January 27, 2025, and January 29, 2025, plaintiff Hall informed the Defendant EHDOC that it had performed unlawful actions and the Plaintiff warned the Defendant that it could incur significant civil and criminal liability.

40. In response, Ms. Riberio stated that she would meet with her internal team to discuss the issues raised and would follow up with Plaintiff regarding the organization's plan to address the concerns. She indicated that a subsequent call would be scheduled to inform Plaintiff of the leadership's decision.

41. On or about January 31, 2025, Ms. Riberio invited Plaintiff to join a follow-up conference call, purportedly to continue the discussion regarding Plaintiff's findings and concerns. However, once the call began, Plaintiff was informed that her employment was being terminated. When she inquired about the reason for her termination, no explanation was provided.

42. Later that same day, January 31, 2025, Plaintiff received a formal termination notice stating that she was being dismissed "due to not meeting the expectations of a VP of Asset Management."

43. Prior to reporting what she reasonably believed to be fraudulent activity, Plaintiff had never received any disciplinary actions, written warnings, or performance improvement plans. Her employment record was free of any indication that her performance was unsatisfactory and/or not meeting the expectations of a VP of Asset Management.

44. Plaintiff's termination occurred only after she reported suspected fraud, waste, and abuse to EHDOC's executive leadership. Plaintiff's termination is a direct result of her reports of fraud.

45. The Plaintiff's internal reporting of fraud, waste, and abuse occurring within EHDOC constituted protected activity.

46. The Plaintiff's protected activity was the but-for cause of her treatment and termination.

## CAUSE OF ACTION

### COUNT ONE
### Retaliation in Violation of the False Claims Act
### (31 U.S.C. § 3730(h))

47. Plaintiff realleges and incorporates by reference the allegations set forth in Paragraphs 17-48 as though fully set forth herein.

48. Plaintiff engaged in protected activity under the False Claims Act by investigating, reporting, and attempting to stop what she reasonably believed to be fraudulent conduct involving the misuse of federal funds and the submission of false claims to the United States government in violation of 31 U.S.C. § 3729-3733.

49. Defendant EHDOC was aware of Plaintiff's protected activity, as Plaintiff's concerns were communicated to senior leadership.

50. In direct response to Plaintiff's protected activity, Defendant subjected her to adverse employment actions to include – termination.

51. Defendant's actions constitute unlawful retaliation in violation of 31 U.S.C. § 3730(h), which prohibits discrimination against employees for lawful acts done in furtherance of an FCA action or efforts to stop violations of the Act.

52. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered and continues to suffer damage, including lost wages and benefits, emotional distress, punitive damage, reputational harm, and other consequential damages (i.e., as a result of the Defendant's unlawful conduct, the Plaintiff Hall not only has been terminated, but her reputation has been marred and she suffers from emotional distress).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands that judgment be entered in her favor against the Defendants as follows:

A. On Count I, judgment against the Defendant for the maximum amount of damages allowed pursuant to 31 U.S.C. § 3730(h);

B. Reasonable attorney's fees and expenses as permitted by applicable statutes and law, including, but not limited to, 31 U.S.C. § 3730(h)(2);

C. Pre- and post-judgment interest as allowed by law; and

D. Any other relief the Court deems just and proper.

## PRAYER FOR A JURY TRIAL

Plaintiff prays a jury trial in this action.

Respectfully submitted,

/s/ Larry Golston
W. Daniel "Dee" Miles, III
Larry A. Golston
Leon Hampton, Jr.
Jessica M. Haynes
Attorneys for Plaintiff

OF COUNSEL:
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax:    (334) 954-7555
Dee.miles@beasleyallen.com
Larry.golston@beasleyallen.com
Leon.hampton@beasleyallen.com
Jessi.Hayns@beasleyallen.com